TVT RECORDS and TVT Music, Inc., Plaintiffs,

v.

THE ISLAND DEF JAM MUSIC GROUP and Lyor Cohen, Defendants.

No. 02 Civ. 6644.

United States District Court, S.D. New York.

March 21, 2003.

James E. d'Auguste, James Philip Chou, Alkin, Gump, Strauss, Hauer & Feld, L.L.P., New York, NY, Peter L. Haviland, Los Angeles, CA, Rhonda R. Trotter, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Los Angeles, CA, for TVT Records, TVT Music, Inc.

Michael T. Mervis, Proskauer, Rose, L.L.P., New York, NY, Mary Mulligan, New York, NY, for the Island Def Jam Music Group.

Robert J. Eddington, Proskauer Rose LLP, New York, NY, Michael T. Mervis, Proskauer, Rose, L.L.P., New York, NY, Alexander Kaplan, Proskauer, Rose, L.L.P., New York, NY, Mary Mulligan, New York, NY, for Lyor Cohen.

### DECISION AND ORDER

MARRERO, District Judge.

During the course of the trial of this action, which commenced on March 10 and ended with jury verdict on March 21, 2003, the Court ruled on several related issues and motions regarding certain evidence defendants The Island Def Jam Music Group and Lyor Cohen ("Cohen" and collectively with The Island Def Jam Music Group, "IDJ") sought to introduce. The Court's consideration of these matters ultimately prompted it to bifurcate the trial into two phases, so as to adjudicate liability and damages separately. The rulings were made from the bench, and the Court's findings and reasoning are recorded and further clarified below.

On March 7, 2003, the Friday before the Monday that trial on this matter was scheduled to commence, IDJ delivered to plaintiffs TVT Records and TVT Music, Inc. ("TVT") a letter and accompanying documents communicating that by this means IDJ had formally given its consent to the agreements that are in dispute in this litigation. This action had been preceded by two other related events. First, during the course of his deposition two days earlier on March 5, 2003, Cohen expressed IDJ's readiness to waive its contractual exclusivity rights over the services of the recording artist professionally known as Ja Rule ("Ja Rule") and the record producer professionally known as Irv Gotti ("Gotti"), and thus permit Gotti and Ja Rule to proceed to complete and deliver to TVT the album (the "CMC Album") that is the subject of the alleged contracts at issue here: the Heads of Agreement (the "Heads of Agreement") between the artists and TVT and the Side

Letter Agreement (the "Side Letter Agreement") between TVT and IDJ.

Second, on February 26, 2003, by letter from Gotti's attorney to TVT, Gotti sought to deliver, purportedly in performance of Gotti's obligations under the Heads of Agreement, a first version of eight new songs recorded during 2002 for the CMC Album by Ja Rule and the two other members of the musical group professionally known as the "Cash Money Click" (the "CMC"). In the transmittal letter, Gotti requested an opportunity to discuss steps necessary to complete the project by selection of the guest artists to be included in the final recording, as called for in the Heads of Agreement. TVT has declined to accept Gotti's invitation to discuss the matter in view of the present litigation and, in particular, IDJ's counterclaim in this action charging TVT with tortious interference with IDJ's contractual relations with Ja Rule and Gotti.

In response to these developments and their timing, TVT requested the Court to grant its motion for summary judgment dismissing IDJ's counterclaim. TVT contended that Gotti's delivery of the CMC Album is tantamount to IDJ's ratification of the Heads of Agreement, thereby becoming a beneficiary of it, and thus manifesting an admission that the Side Letter Agreement had been approved. TVT also moved for the exclusion at trial of any testimony or documents relating to these three events, arguing that IDJ's attempt, through its March 7, 2003 letter, to approve the Side Letter Agreement and Heads of Agreement and thus reverse its repudiation of these contracts in August 2002, cannot now serve legally to reinstate agreements already formally rejected. TVT maintained that introduction of such evidence at this stage of the proceedings would be confusing to the jury and prejudicial to TVT.

IDJ responded that evidence of its consent to the underlying agreements and waiver of its exclusivity rights, as well as of Gotti's delivery of the CMC Album tracks to TVT, even if incomplete, should be permitted because it is relevant to the jury's determination as to whether—now that TVT has in hand a version of the recordings and Gotti's representation of his readiness to complete them, as well as the legal approvals whose denials prompted the instant lawsuit—TVT has availed itself of every reasonable opportunity to mitigate any damages to which TVT may be entitled if the jury found IDJ liable.

TVT's requests presented the Court with a situation that appears to reflect a conflict of legal theories. On the one hand, TVT argued that IDJ's putative consent to the Heads of Agreement by means of the signing of the Side Letter Agreement on March 7, 2003 was an invalid effort to withdraw a prior repudiation and that, as such, the action had no legal effect, though reference to it at trial would have the practical consequence of confusing and misleading the jury. But TVT argued as well that IDJ's execution of the Side Letter Agreement also operated to nullify IDJ's counterclaim because, according to TVT, IDJ cannot rightfully assert that a contract to which IDJ assents and becomes a beneficiary could form the basis for a breach of its exclusivity contracts with Ja Rule and Gotti.

█ The Court recognizes that whether IDJ sufficiently manifested assent in September 2001 to the material terms of the Side Letter Agreement to permit the CMC Album to go forward is a jury question. If in fact a contract was validly formed at that time—whether in writing, orally or through conduct—IDJ's letter of August 14, 2002 to TVT purporting to reject the Side Letter Agreement and withhold IDJ's consent to the Heads of Agreement consti-

tuted a repudiation of the parties' contract. In that event, IDJ's attempted corporate approval and execution of the Side Letter Agreement on March 7, 2003 amounted to an ineffective unilateral effort to withdraw its prior repudiation. On the other hand, if IDJ did not agree to the Side Letter Agreement in September 2001, then IDJ's August 2002 repudiation letter to TVT represents something akin to an affirmation of IDJ's withholding of its consent to the Heads of Agreement. Either prospect would render the March 7, 2003 signing of the Side Letter Agreement as simply an offer to form a contract; the Court does not construe the communication to manifest an acceptance of any prior offer still outstanding. For the Court to rule otherwise would effectively remove from the jury a threshold issue it is here being charged to determine: whether the parties' interactions culminating in the Side Letter Agreement formed a binding contract in the first place and, if so, whether that contract was breached by IDJ in August 2002.

In light of the nature of TVT's claims and underlying theories of liability, and the legal ineffectiveness of IDJ's purported March 7, 2003 approval of the Side Letter Agreement—to the extent IDJ argues such consent actually constituted an acceptance of the Side Letter proposal—the Court found that permitting introduction of evidence regarding the putative consent for any other purpose at this time would be more prejudicial than probative. Accordingly, the Court concluded that all evidence concerning IDJ's communication of its alleged acceptance of the Side Letter Agreement through its March 7, 2003 signing of that agreement, and any attendant documents or testimony, must precluded.

■ IDJ then argued that, even if evidence of its March 7, 2003 acceptance of the Side Letter Agreement were barred, the jury nonetheless should be permitted to hear evidence that Gotti sought to deliver the new tracks for the CMC Album and that IDJ, as Cohen acknowledged in his deposition on March 5, 2003, had consented at that time to waive its rights to the exclusive services of Ja Rule and Gotti. IDJ maintained that it presumably has a right to take such action unilaterally even absent the Side Letter Agreement with TVT here at issue. According to IDJ, such evidence is relevant both to the issue of whether IDJ took action to interfere with Gotti's efforts to perform his contractual obligations to TVT and to TVT's duty to mitigate any injury it may prove in this action.

TVT argued that such evidence, whether in the form of IDJ's March 7, 2003 purported consent or IDJ's unilateral expression of waiver of exclusivity or Gotti's performance, would be no less confusing to the jury and unduly prejudicial to TVT if introduced for the first time at such a late stage of the proceedings.

It is true that TVT has a legal duty to mitigate damages, and that IDJ has the burden of proof to establish that TVT has failed to avail itself of reasonable mitigation measures or opportunities open to it. Here, however, the evidence addressing mitigation that IDJ sought to introduce relates to circumstances defendants raised literally on the eve of trial. The Court remains persuaded that these efforts came too late. Whether as proof of IDJ's purported acceptance of the Side Letter Agreement, or as a representation that IDJ now consents to a waiver of its exclusivity rights, the Court concluded that such evidence is legally deficient to signify IDJ's valid consent to the parties' alleged contract. Its introduction at this point has the potential for substantial confusion to the jury and would be unduly prejudicial to TVT.

First, as already discussed above, the question of whether IDJ validly entered into the Side Letter Agreement and later breached the contract remains a material issue of fact for the jury to resolve. If the Side Letter Agreement reflects a valid contract, the date that the alleged breach of it occurred commences the computation of damages. For the purposes of this trial, the date presumably would be that of IDJ's repudiation of the contract: August 14, 2002. The jury cannot be led to speculate that because a waiver of exclusivity was given by IDJ in some form on the eve of trial, it may then assume that IDJ's contention that no contract between the parties existed in September 2001 must be correct, and that it necessarily would follow that TVT now has received what it wanted and that no liability or damages exist.

Second, because IDJ's purported waiver action arose so late in the litigation, the parties have not had adequate opportunity to examine or take depositions or other discovery concerning the precise legal or financial effects of IDJ's waiver granting consent for the CMC Album at this point. For example, given the Court's exclusion of IDJ's March 7, 2003 purported approval of the Side Letter Agreement, there is no undisputed evidence on the record that IDJ's waiver of its exclusivity rights has otherwise been validly given. Cohen's statements at his deposition in this action may or may not suffice to effectuate a valid waiver of IDJ's exclusivity rights. It is conceivable, for instance, that some formal corporate clearances, through the same internal procedure IDJ has asserted would be a prerequisite to its approval of the Side Letter Agreement, may be a necessary condition for IDJ to grant a binding waiver of exclusivity.

Moreover, as discussed below, absent a valid contract allocating the shares of the parties' respective financial interests in the CMC Album, a unilateral voluntary waiver by IDJ of its exclusivity rights gives rise to questions concerning the distribution of profits to which TVT would be entitled from the project and as to the warranted assumptions the jury may be permitted to make in this regard. For the foregoing reasons, the Court concluded that evidence of IDJ's claim that Cohen effectively waived IDJ's exclusivity rights must be precluded.

Gotti's recent delivery of a portion of the CMC Album presented a more difficult issue. Evidence relating to this development has relevance for several purposes. TVT alleges in this litigation that IDJ wrongfully prevented Gotti from delivering the CMC Album in time for release in November 2002. In this connection, Gotti's explanation of how and why the delivery and release dates of the CMC Album were changed from the originally contemplated timeframe of the fourth quarter of 2002 has bearance on the state of defendants' knowledge of and participation in the underlying events during August 2002. Gotti's attempted delivery of portions of the CMC Album in late February 2003 may be viewed as a strand relevant to complete the story.

The purported delivery of the CMC recordings occurred at a time sufficiently before Gotti's deposition that TVT had opportunity to question Gotti about it and test the credibility and strength of his commitment to complete the project. Moreover, as TVT itself has argued, Gotti is contractually committed to TVT through the Heads of Agreement to produce the CMC Album, together with obtaining all necessary consents, at the risk of incurring liability to TVT for non-performance. On TVT's theory, this obligation exists independently of any contractual relationship between TVT and IDJ by which IDJ would give TVT its approval for the CMC

Album project. In other words, whether or not IDJ consents to the Side Letter Agreement, theoretically Gotti may still be able to procure IDJ's valid authorization through other means flowing out of adjustments in his other business and personal relationships with IDJ.

Finally, the evidence goes to the question of whether and when TVT would have a CMC Album it could exploit, thus mitigating any damages award to TVT in this action. It is this purpose that presented a delicate conundrum. If offered as an aspect of mitigation, Gotti's purported delivery of the recording and representation that he is now prepared to proceed, pose formidable difficulties. TVT strenuously insists that on this record, given the lateness of the attempted introduction of the evidence, the jury does not have a sufficient basis to consider the CMC Album "roughs" Gotti sought to transmit to TVT as qualifying evidence of mitigation. The Court agrees.

The introduction of such material would extend to the jury an open invitation to a field day of speculation. First, and most fundamental, for the jury to consider Gotti's delivery of the CMC tracks in furtherance of his obligations to TVT qualifying as a mitigation opportunity presents the same deficiency and dangers as the evidence of IDJ's attempted consent to the Side Letter Agreement or waiver of exclusivity. As already detailed above, it presupposes or implies the validity of the means or the agreements under which Gotti now purports to carry out his commitment. From this act, the jury may very well deduce that if Gotti was carrying out his promises under the Heads of Agreement, it must be because he was doing so pursuant to IDJ's consent properly given under a valid Side Letter Agreement. Such a conclusion effectively would prejudge precisely the question that the jury will be called upon to answer in connection with the parties' underlying contract claims. In other words, the jury could improperly determine that because some version of the CMC Album recording was delivered now and Gotti is prepared to complete them, authority for these actions must have derived from an effective Side Letter Agreement and TVT no longer should have anything to complain about.

Conceivably the jury could also assume that Gotti undertook to deliver part of the album at his own risk, outside the constraints of the parties' agreements here in question and in accordance with his own relationships with IDJ. In that event, however, if IDJ is not to be factored as a party or beneficiary of TVT's agreement with the artists, and if this jury were to award damages to TVT, what assumptions could it reasonably make, and on what basis would it assess the extent of the injury, with regard to the apportionment of projected profits from the CMC Album venture as between only Gotti and TVT? How would this change alter the dynamics of the relationship among the participants and the calculation of damages from projected lost profits to which TVT might reasonably be entitled if the jury finds IDJ liable?

There is nothing on the record suggesting that TVT and Gotti contemplated this contingency in any way, nor indeed is there a basis for any reasonable assumption that IDJ would be a party to such a prospect. Finally, because the issue arose so late in proceeding and its resolution had to await a final determination by the Court after the trial had already commenced, TVT, as it contended, did not have adequate opportunity to prepare a full presentation at trial addressing the effects of Gotti's actions or to alter its trial strategy and expert computation of damages to account for this new assumption once the evidence in question was introduced.

Another area fraught with contingency and potential jury conjecture relates to the degree of reality that may be accorded to the likelihood of full delivery of a finished CMC Album. Whatever the jury may conclude about Gotti's credibility, and the intensity of his commitment to proceed at this time, cannot detract from actual and practical considerations that imbue the prospect of completion and delivery of the album with chronic uncertainties. According to TVT, Gotti himself confirmed that the version of the CMC Album he delivered on February 26, 2003 is not complete but only "roughs" of eight new songs, and thus does not fully satisfy the artists' duties under the Heads of Agreement in several material respects. The old CMC masters to be included in the new album have not been selected or refined. The guest artists the project calls for have not been identified, nor have they been made available with appropriate legal consents. The new recordings have not been perfected. The songs in the album have not been mixed. A promotion and marketing plan involving the artists has not been developed and approved. These are all circumstances subject to vagaries and vital details that could require substantial time to resolve and that potentially could derail the project regardless of Gotti's expression of present good intentions.

On this point, the Court cannot ignore an overarching reality dramatized by Gotti's own testimony. If there is a monumental question mark here concerning the likelihood of ultimate delivery of the CMC Album to TVT, it is embodied by Gotti himself. To forecast what he may or may not do perhaps may be best characterized, to borrow from Winston Churchill, as confronting a riddle wrapped in a mystery inside an enigma. But the Court need not resort to external wisdom or graphics to portray Gotti. It need only turn to the words of defendants' counsel already on the trial record to portray Gotti. In the words of Mr. Ortner, Gotti is a "force of nature." Mr. Kempler said of him, with kind understatement, that Gotti does not "color within the lines." Perhaps the best reflection of Gotti is Mr. Ortner's suggestion that Gotti is exactly what TVT's chief executive Steve Gottlieb got and deserved for contractually dealing with such a free spirit.

Gotti testified that release deadlines mean little in the record industry and almost nothing to him. He expressed equal lack of concern for the text or formalities of his contractual obligations to his business partners, whether IDJ or TVT. By his own account his is the only artistic judgment that counts for him. His management style seems to be to record first and let others ask questions and seek approvals later. When told "no", his instinctive reaction is to do the opposite, so as to prove the naysayer wrong.

Given the self-described hardness, independence and unpredictability of such a personality, what if Gotti were to decide, for his own artistic reasons, to record as guests artists for the CMC Album performances by Eminem, or Michael Jackson, or Michael Jordan, for that matter—if any of them happen to be in the studio when Gotti is recording for TVT's project— without obtaining necessary consents from the guest artists' recording companies? No disrespect or levity is here intended; however, on the basis of Gotti's own statements, prospects of this kind are not entirely far-fetched, and could create obstacles to the completion of the CMC Album. In fact, as Gotti testified, and as was played in court, in one version of one of the new CMC songs that he recorded, Gotti added a guest appearance by Ashanti, an IDJ recording artist. He also acknowledged that the first version of "The Last Temptation", Ja Rule's latest solo album that Gotti produced for IDJ, includ-

ed three of the new recordings that were prepared for the CMC Album and paid for by TVT. He also declared that, defying Cohen's wishes or instructions, he inserted Ja Rule as a guest artist in an album recorded by Jennifer Lopez performing for a competing label.

These circumstances lend credence to TVT's concern that Gotti's actions and assurances would not necessarily translate into a finished, marketable CMC Album. TVT therefore argued that the jury should not be permitted to so speculate and, on that basis, reduce its computation of damages to TVT by some amount conjecturally attributable to an assumption that TVT currently has the ability to exploit the CMC Album.

The Court agrees that there is substantial uncertainty in the likelihood of Gotti's delivery of a final product to TVT. It would work a practically irreparable inequity were the jury, given the doubts associated with this proposition, to diminish any award to TVT in reliance that that assumption would come to pass. At the same time, it would be equally insupportable to permit TVT a recovery that would ignore the possibility, however indefinite it may be at present, that Gotti would honor his obligation and would deliver a completed recording TVT could exploit. In that event, unless a means were devised to account for the portion of lost profits built into the verdict that TVT were later to recoup, TVT would be handed a windfall.

■ To address this dilemma, the Court proposed to bifurcate the trial, allowing the jury already hearing the case to determine liability and scheduling the damages phase to be determined, upon consent of the parties, either: (1) at a subsequent bench trial, or (2) assuming sufficient authority exists for such a procedure, at a post-trial proceeding for which the Court would retain equitable jurisdiction for a reasonable period of time following a ver-

dict in order to then consider evidence regarding TVT's mitigation of damages. Alternatively, the Court considered the remaining course to be a separate trial on damages before the current jury or a different one.

The parties' responses to these options diverged sharply, and at times reflected self-contradiction. TVT favored some form of post-trial equitable accounting conducted by the Court, and vigorously opposed a bifurcation if it would require any delay in concluding the trial, and even if it would entail TVT's having to waive objections to the introduction of the evidence regarding Gotti's purported delivery of the CMC Album roughs. IDJ asserted that under no circumstances would it forego its right to jury assessment of damages, and challenged the basis for the Court to retain jurisdiction for a post-verdict determination regarding mitigation. While it initially opposed bifurcation, when the Court signaled that it was inclined to reject TVT's post-verdict equitable accounting concept, IDJ urged a subsequent full jury trial on damages and mitigation. However, because the relief TVT seeks in several of its claims includes recovery of punitive damages, and because questions regarding the degree of culpability and appropriate penalty are so integrally interconnected, IDJ insisted that the punitive damages aspect of the trial could not be divided from the liability phase and heard by a different jury, contending that to so bifurcate the proceeding would be wrongfully prejudicial to defendants. TVT maintained, on the other hand, that there is no legal barrier to allowing the liability jury to decide whether defendants' conduct was sufficiently severe to warrant punitive damages and, if so, to charge the damages jury to quantify an appropriate award. *See, e.g., Robinson v. Metro–North Commuter Railroad Co.,* 267 F.3d 147, 169 (2d Cir.2001); *Blyden v. Mancusi,* 186 F.3d

252, 268 (2d Cir.1999); *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 374 (2d Cir.1988); *In re New York Asbestos Litig.,* No. 88 Civ. 4213 to 88 Civ. 4219, 88 Civ. 4221, 88 Civ. 4222, 1990 WL 100811, at *1 (S.D.N.Y. July 9, 1990).

After weighing the parties' arguments and the various issues presented, and considering the alternatives, the Court concluded that, on balance, the following course would best accommodate the competing interests here at stake: (1) the trial would be bifurcated into separate liability and damages phases; (2) the damages aspect, including mitigation and punitive damages, would be determined by a jury; (3) the damages component would be presented to the same jury panel that determines liability, either immediately following the liability phase or as reasonably soon thereafter as the parties and the jurors are ready to proceed; (4) by means of a limiting instruction, the liability jury would be directed to disregard evidence of Gotti's recent attempted delivery of the portion of the CMC Album, insofar as such evidence may already have been admitted prior to this ruling.

In deciding upon this course, the Court found compelling the following considerations: (1) allowing the same jury to decide both aspects of the trial would serve the interests of judicial economy and otherwise conserve resources by avoiding or minimizing the need to present overlapping evidence, or repeat issues and test the credibility and demeanor of witnesses that have already been considered by the current jury panel; (2) maintaining the punitive aspect of the case with the same jury would also minimize the perils inherent in managing a bifurcation of punitive damage liability without running afoul of the Seventh Amendment of the United States Constitution, specifically that a second jury would endeavor to redecide issues already determined by the liability jury,

thus engendering prejudice to defendants, *see, e.g., Robinson,* 267 F.3d at 169; *Blyden,* 186 F.3d at 268; *Smith,* 861 F.2d at 374; (3) since the trial is to be bifurcated, the jury determining liability will have no reason to consider evidence addressing TVT's mitigation duty and opportunities, and thus the material regarding Gotti's attempted delivery of a portion of the CMC Album and testimony that he is now prepared to complete the project is not relevant for this purpose. To the extent as the evidence may bear upon other issues, the Court deems it cumulative and, for the reasons already described, more prejudicial than probative.

Having concluded that bifurcation of the trial and use of the same jury for the entire damages phase are both essential— in the interest of justice, to preserve the integrity of the litigation and conserve judicial resources—the Court proposed to the parties several alternative dates for commencement of the damages proceeding, depending on their convenience and that of the eight jurors on the panel. Assuming that the trial concluded as scheduled prior to March 21, the Court suggested the weeks of March 24, April 14, April 21 or April 28, 2003. In finally selecting the week of April 28 the Court took into account, in addition to the considerations set forth above, that Mr. Ortner, defendants' lead trial counsel, represented to the Court, on the record and in a letter to the Court dated March 19, 2003, that by reason of a medical condition, he would not be in a position to inform the Court of his availability to begin the damages trial until, at the earliest, March 27, 2003, and that other members of IDJ's legal team similarly had other commitments that required them to take some recess before the resumption of this trial. When the Court again addressed this issue on March 21, after inviting counsel's views and prior to informing the jury of the possible dates for the continuation of the trial, Mr. Ortner

asserted that because of his need to address the underlying medical condition referred to, he would not be available to resume the trial until, at earliest, the last week the Court proposed: April 28. In confirmation, he presented a letter from his treating physician, Dr. Kenneth Croen, dated March 21, 2003 corroborating that Mr. Ortner was receiving medical care for a condition that was incompatible with the physical demands that a prolonged trial at this time would impose, and that Mr. Ortner will require the next several weeks for full recuperation.

Substantially, if not entirely, based on its endeavor to accommodate Mr. Ortner's availability, the Court selected the week of April 28, 2003 as the date for adjournment of the trial for the damages phase and so arranged with the sitting jury. In this regard, the Court reiterates and underscores that: (1) it had expressed its availability to continue the damages trial with the same jury during the week of March 24, which would have entailed no break in the jury's service following its verdict on liability; (2) TVT had already conveyed a preference for no additional delay and availability to continue the trial with the same jury and without any adjournment; and (3) had IDJ's counsel not urged a delay on medical grounds, the Court would have been more persuaded that, so as to minimize inconvenience and hardships to the parties, the Court and members of the jury, and on the assumption that no more than two or three days of additional trial time and jury service would be necessary, a continuation of the damages phase during the week of March 24 would have been the most advisable of the alternatives the Court considered.

### ORDER

Accordingly, for the reasons set forth above, it is hereby

**ORDERED** that the trial of this action shall be bifurcated into separate liability and damages components; and it is further

**ORDERED** that the jury composed of the eight remaining members empaneled on March 10, 2003 to hear this action, having rendered a verdict on the liability phase of the case in accordance with the Jury Verdict Sheet dated March 21, 2003 submitted to it, a copy of which is attached and incorporated hereto, the same eight remaining jurors shall not be discharged but shall be adjourned and empaneled to continue serving to determine the damages phase of the trial; and it is further

**ORDERED** that the Court of Clerk is directed to promptly give notice to and summon those eight jurors for continuation of jury service with regard to the damages phase of this action on the adjourned date of April 28, 2003 at 9:00 a.m.; and it is finally

**ORDERED** that, for the reasons stated on the record on March 18, 2003, TVT Records's and Steven Gottlieb's motion dated February 25, 2003 for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing IDJ's counterclaims for tortious interference with contractual relations is DENIED.

**SO ORDERED.**

TVT RECORDS and TVT MUSIC, INC. v.
THE ISLAND DEF JAM MUSIC GROUP
and LYOR COHEN

02 Civ. 6644
### JURY VERDICT SHEET

### I. PLAINTIFFS' CLAIMS

#### A. BREACH OF CONTRACT

**QUESTION NUMBER 1**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of breach of contract, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam Music Group is liable for breach of contract?

Yes___✓___   No_____

#### B. PROMISSORY ESTOPPEL

**QUESTION NUMBER 2**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of promissory estoppel, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam Music Group is liable under the doctrine of promissory estoppel?

Yes___✓___   No_____

Foreperson's Name (Print) _JOSEPHINE SYKES_

Foreperson's Signature: _Josephine Sykes_

Date: _3/21/2003_

Court
Exhibit #8

## C.    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

**QUESTION NUMBER 3**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam Music Group is liable for tortious interference with plaintiffs' contractual relations with Jeffrey Atkins (p/k/a Ja Rule) and Irving Lorenzo (p/k/a/ Irv Gotti)?

Yes ✓        No____

**QUESTION NUMBER 4**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for tortious interference with contractual relations?

Yes ✓        No____

## D.    FRAUD

**QUESTION NUMBER 5**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant The Island Def Jam Music Group is liable for fraud by fraudulent misrepresentation?

Yes____        No ✓

**QUESTION NUMBER 6**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant Lyor Cohen is liable for fraud by fraudulent misrepresentation?

Yes____        No ✓

Foreperson's Name (Print) _JOSEPHINE SYKES_

Foreperson's Signature: _Josephine Syke_

Date: _3/21/03_

**QUESTION NUMBER 7**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant The Island Def Jam Music Group is liable for fraud by fraudulent inducement?

Yes_____ No__✓_

**QUESTION NUMBER 8**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant Lyor Cohen is liable for fraud by fraudulent inducement?

Yes_____ No_✓_

**QUESTION NUMBER 9**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant The Island Def Jam Music Group is liable for fraud by fraudulent concealment?

Yes_✓_ No_____

**QUESTION NUMBER 10**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of fraud, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by clear and convincing evidence that defendant Lyor Cohen is liable for fraud by fraudulent concealment?

Yes_✓_ No_____

Foreperson's Name (Print) _JOSEPHINE SYKES_

Foreperson's Signature: _Josephine Syk_

Date: _3/21/03_

## E.    COPYRIGHT INFRINGEMENT

**QUESTION NUMBER 11**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam Music Group is liable for copyright infringement with respect to "The Rain"? If your answer to Question 11 is "No," then skip to Question 13.

Yes ✓    No____

**QUESTION NUMBER 12**

If your answer to Question Number 11 is "Yes," then considering the elements and factors described in the Court's instructions on willful copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam Music Group is liable for willful copyright infringement with respect to "The Rain"?

Yes ✓    No____

**QUESTION NUMBER 13**

Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for copyright infringement with respect to "The Rain"? If your answer to Question 13 is "No", then skip to Question 15.

Yes ✓    No____

**QUESTION NUMBER 14**

If your answer to Question Number 13 is "Yes," then considering the elements and factors described in the Court's instructions on willful copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for willful copyright infringement with respect to "The Rain"?

Yes ✓    No____

Foreperson's Name (Print) _JOSEPHINE  SYKES_

Foreperson's Signature: _Josphine Syks_

Date: _3/21/03_

**QUESTION NUMBER 15**
*Considering the elements and factors described in the Court's instructions with regard to plaintiffs'
claim of copyright infringement, and weighing the parties' respective presentations of evidence and
arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT
Music, Inc. have proven by a preponderance of the evidence that defendant The Island Def Jam
Music Group is liable for copyright infringement with respect to "Get Tha Fortune"? If your answer
to Question Number 15 is "No," then skip to Question 17.*

Yes ✓  No____

**QUESTION NUMBER 16**
*If your answer to Question Number 15 is "Yes," then considering the elements and factors described
in the Court's instructions on willful copyright infringement, and weighing the parties' respective
presentations of evidence and arguments supporting and opposing this claim, do you find that
plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that
defendant The Island Def Jam Music Group is liable for willful copyright infringement with respect
to "Get Tha Fortune"?*

Yes ✓  No____

**QUESTION NUMBER 17**
*Considering the elements and factors described in the Court's instructions with regard to plaintiffs'
claim of copyright infringement, and weighing the parties' respective presentations of evidence and
arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT
Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for
copyright infringement with respect to "Get Tha Fortune"? If your answer to Question Number 17
is "No," then skip to Question 19.*

Yes ✓  No____

**QUESTION NUMBER 18**
*If your answer to Question Number 17 is "Yes," then considering the elements and factors described
in the Court's instructions on willful copyright infringement, and weighing the parties' respective
presentations of evidence and arguments supporting and opposing this claim, do you find that
plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that
defendant Lyor Cohen is liable for willful copyright infringement with respect to "Get Tha Fortune"?*

Yes ✓  No____

Foreperson's Name (Print) *JOSEPHINE SYKES*

Foreperson's Signature: *Josphine Syf*

Date: *3/21/03*

**QUESTION NUMBER 19**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of vicarious copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is vicariously liable for copyright infringement with respect to "The Rain"?

Yes ✓     No____

**QUESTION NUMBER 20**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of vicarious copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is vicariously liable for copyright infringement with respect to "Get Tha Fortune"?

Yes ✓     No____

**QUESTION NUMBER 21**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of contributory copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for contributory copyright infringement with respect to "The Rain"?

Yes ✓     No____

**QUESTION NUMBER 22**
Considering the elements and factors described in the Court's instructions with regard to plaintiffs' claim of contributory copyright infringement, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that plaintiffs TVT Records and TVT Music, Inc. have proven by a preponderance of the evidence that defendant Lyor Cohen is liable for contributory copyright infringement with respect to "Get Tha Fortune"?

Yes ✓     No____

Foreperson's Name (Print) JOSEPHINE SYKES
Foreperson's Signature: Josephine Syk
Date: 3/21/03

## II. <u>COUNTERCLAIM</u>

**QUESTION NUMBER 1**

Considering the elements and factors described in the Court's instructions with regard to counterclaimant's claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that counterclaimant The *Island Def Jam Music Group* has *proven by a preponderance of the* evidence that counterclaim-defendant TVT Records is liable for tortious interference with The Island Def Jam Music Group's contractual relations with Jeffrey Atkins (p/k/a Ja Rule)?

Yes____ No ✓

**QUESTION NUMBER 2**

Considering the elements and factors described in the Court's instructions with regard to counterclaimant's claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that counterclaimant The *Island Def Jam Music Group* has *proven by a preponderance of the* evidence that counterclaim-defendant TVT Records is liable for tortious interference with The Island Def Jam Music Group's contractual relations with Irving Lorenzo (p/k/a Irv Gotti)?

Yes____ No ✓

**QUESTION NUMBER 3**

Considering the elements and factors described in the Court's instructions with regard to counterclaimant's claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that counterclaimant The *Island Def Jam Music Group* has *proven by a preponderance of the* evidence that counterclaim-defendant Steven Gottlieb is liable for tortious interference with The Island Def Jam Music Group's contractual relations with Jeffrey Atkins (p/k/a Ja Rule)?

Yes____ No ✓

**QUESTION NUMBER 4**

Considering the elements and factors described in the Court's instructions with regard to counterclaimant's claim of tortious interference with contractual relations, and weighing the parties' respective presentations of evidence and arguments supporting and opposing this claim, do you find that counterclaimant The *Island Def Jam Music Group* has *proven by a preponderance of the* evidence that counterclaim-defendant Steven Gottlieb is liable for tortious interference with The Island Def Jam Music Group's contractual relations with Irving Lorenzo (p/k/a Irv Gotti)?

Yes____ No ✓

Foreperson's Name (Print) *JOSEPHINE SYKES*

Foreperson's Signature: *Josephine Syke*

Date: *3/21/03*