TVT RECORDS and TVT Music,
Inc., Plaintiffs,

v.

THE ISLAND DEF JAM MUSIC
GROUP and Lyor Cohen,
Defendants.

No. 02 CIV. 6644.

United States District Court,
S.D. New York.

April 23, 2003.

738

James E. d'Auguste, Akin, Gump,
Strauss, Hauer & Feld, L.L.P., James
Philip Chou, Akin, Gump, Strauss, Hauer
& Feld, L.L.P., New York, NY, Peter L.
Haviland, Rhonda R. Trotter, Akin Gump
Strauss Hauer & Feld, LLP, Los Angeles,
CA, Tuneen E. Chisolm, Akin, Gump,
Strauss, Hauer & Feld, L.L.P., New York,
NY, for TVT Records, TVT Music, Inc.,
plaintiffs.

Michael T. Mervis, Proskauer, Rose,
L.L.P., Mary Mulligan, Esq., Universal
Music Group, New York, NY, for the Is-
land Def Jam Music Group.

Robert J. Eddington, Proskauer Rose
LLP, Michael T. Mervis, Proskauer, Rose,
L.L.P., Alexander Kaplan, Proskauer,
Rose, L.L.P., Mary Mulligan, Esq., Uni-
versal Music Group, Matthew S. Dontzin,
James M La Rossa, New York, NY, for
Lyor Cohen.

### DECISION AND ORDER

MARRERO, District Judge.

In anticipation of the damages phase of
the trial of this matter, plaintiffs TVT Rec-
ords and TVT Music, Inc. (collectively
"TVT") have filed a Motion In Limine To
Exclude From Evidence Reference To (i)
IDJ's And Cohen's Purported Consent To
The CMC Album And (ii) Gotti's Purport-
ed Delivery of CMC Tracks To TVT, dated

April 16, 2003, and a Motion In Limine To Permit TVT To Submit Evidence Of Its Legal Expenses To The Jury As Part Of Its Punitive Damages Case, dated April 16, 2003. Defendants The Island Def Jam Music Group ("IDJ") and Lyor Cohen ("Cohen") (collectively "Defendants") have filed a Notice Of Motion *In Limine* To Exclude Evidence Of Net Worth, dated April 16, 2003 and a Notice Of Motion *In Limine* To Preclude Certain Evidence And/Or Argument Related to Punitive Damages, Consistent With Recent United States Supreme Court Precedent, dated April 16, 2003.[1] The Court has reviewed the parties' submissions in support of and in opposition to these various motions. The following discussion will address the issues raised in turn. For the reasons discussed below, the motions are GRANTED IN PART, DENIED IN PART.

## I. *DISCUSSION*

### A. *THE MARCH 7, 2003 SIDE LETTER AGREEMENT AND CORRESPONDING IDJ APPROVAL MEMORANDUM*

TVT seeks to preclude references to and admission of the version of the Side Letter Agreement signed and delivered to TVT on March 7, 2003. For the reasons articulated on the record on March 10, 2003 and in the Court's Decision and Order dated March 21, 2003 (the "March 21 Decision"),[2] the signing and delivery on March 7, 2003 of the Side Letter Agreement is of dubious legal effect given the history of the parties' dealings up to that point, thus undermining the probative value and, indeed, the reliability, of the representations expressed. At best, as already stated more fully in the March 21 Decision, that document, when transmitted to TVT on March 7, 2003, represents, perhaps, an offer to consent or a purported grant of consent to the Side Letter Agreement, a contract that IDJ had formally repudiated on August 14, 2002. Nonetheless, as explained, such an offer or putative consent being expressed in the form of a signed (yet legally ineffective) acceptance of the Side Letter Agreement—a matter at the very heart of this litigation—was deemed by the Court to be more prejudicial than probative. The Court concluded, for various expressed reasons, that such a result would obtain insofar as the purported consent likely would have misled the jury into overvaluing IDJ's offer, given its timing and the form in which it was conveyed. The Court was concerned that the jury could improperly be led to believe that TVT had thereby received the benefit of the contract it bargained for and, as a result, could not have been measurably injured. Such evidence was excluded from the liability phase of this trial on this basis.

▆▆▆ TVT likewise seeks to exclude that evidence now from the damages phase. The Court finds that the same legal barriers and prejudicial risks previously identified on the record on March 10, 2003 and in the March 21 Decision require the continued exclusion of IDJ's attempted consent to the Side Letter Agreement during the damages phase. Seeing IDJ's purported consent expressed in the form of a signed (yet legally ineffective) acceptance of the Side Letter Agreement is likely to mislead the jury. The jury is no less likely at this stage to overvalue the import of a document that has no legal effect, and to ignore other practical considerations regarding the likelihood of the CMC Album project's completion as well as less tangi-

---

**1.** The former motion was filed by Cohen and the latter by IDJ, but each defendant expressly joined in the arguments and positions of the other in their entirety.

**2.** The March 21 Decision is reported as *TVT Record, TVT Music, Inc. v. The Island Def Jam Music Group, Lyor Cohen,* 254 F.Supp.2d 322 (S.D.N.Y.2003).

ble cooperation by IDJ necessary to the process of creating and exploiting the CMC Album, and thus to conclude that TVT is as free now to exploit a CMC Album as it would have been in the absence of any of the wrongs the jury already concluded were committed by IDJ and/or Cohen. Such a misapprehension would result in the jury undervaluing the extent of the damages to which, properly valued, TVT may be entitled, whatever that may be. Or, indeed, the jury may conclude, as a consequence of relying on that legally ineffective document, that TVT has not been harmed at all. As before, because it is not likely that a curative instruction could properly account for and explain the significance of such evidence, the prejudice to TVT cannot be overcome absent exclusion of the document and testimony related to it.

On March 8, 2003, a Memorandum dated March 3, 2003 (the "Approval Memo") was delivered to TVT that, on its face, indicated IDJ's internal approvals for IDJ's participation in the CMC Album project via the Side Letter Agreement. Because this five-sentence memorandum (plus attachments) references not only Irv Gotti's ("Gotti") February 26, 2003 delivery to TVT of certain materials for the CMC Album [3] but also, more importantly, IDJ's entering into the March 7, 2003 version of the Side Letter Agreement, which is attached and incorporated to the Approval Memo, this material cannot be considered by the jury independently. For, even if the attachments were removed and references to it redacted, the necessary import of an approval memorandum on a given topic, in light of past testimony on the matter, is that the Side Letter Agreement had been or was soon to be signed by IDJ. In this way, the Approval Memo imports the same concerns identified above regarding the March 7, 2003 version of the Side

Letter Agreement executed by IDJ. Additionally, the Approval Memo inaccurately characterizes the material delivered to TVT on February 26, 2003 as "master recordings," when, in fact, Gotti himself testified during the liability phase that these materials were so-called "roughs." Introduction of this document would require clarification of this discrepancy, thereby drawing the jury into yet another distracting sidetrack in regards to this evidence. The Approval Memo also characterizes Gotti's intent by referencing and presumably reaffirming contractual obligations to TVT, thus potentially implying to a lay juror that the Heads of Agreement between TVT and Gotti and Ja Rule (the "Artists") had not been breached and that, accordingly, TVT has not been damaged. For these various reasons, the Approval Memo must also be precluded from evidence as more prejudicial than probative.

### B. GOTTI'S FEBRUARY 26, 2003 DELIVERY OF CMC "ROUGHS" AND SURROUNDING CORRESPONDENCE

■ TVT also seeks to preclude as more prejudicial than probative evidence of Gotti's delivery to TVT of so-called "rough" tracks for the CMC Album on February 26, 2003. This request is denied. Gotti's attempted delivery itself would not create a misimpression of a legally binding obligation arising out of the March 7, 2003 version of the Side Letter Agreement and, accordingly, is not so likely to mislead the jury into believing that TVT's position has not been impaired by the Defendants' actions. As the Court noted in the March 21 Decision, it is not inconceivable that, by reason of Gotti's unique relationships with IDJ, and deriving specifically from those ties, Gotti could procure IDJ's consent to the CMC Album flowing directly to Gotti,

---

**3.** Gotti's delivery is addressed in Section I.B *infra.*

rather than to TVT, and irrespective of IDJ's consent to the Side Letter Agreement. *See TVT Records*, 254 F.Supp.2d 322, at 325. Consequently, Gotti's purported delivery may present grounds for IDJ and Cohen to argue that TVT ignored a reasonable opportunity to mitigate potential loss if they can establish by competent evidence that the Artists had a legitimate basis, arising out of their various relationships with IDJ, to perform their obligations to TVT under the Heads of Agreement independent of IDJ's consent. While the Court recognizes TVT's concern that the timing of this delivery on February 26, 2003—so close to the start of this trial and so late in the parties' dealings on this matter—left TVT with little time to act on this delivery so as to mitigate its losses, this circumstance can easily be presented to the jury for consideration during the damages phase, as can TVT's other stated (and any unstated) reasons for not pursuing this putative opportunity to mitigate, which include jury questions concerning whether in fact a sufficient basis exists, contractual or otherwise, for Gotti to validly perform any obligation to TVT; the credibility and sincerity of Gotti's and IDJ's commitment to see the project through; the feasibility of completion in light of other commitments and capabilities of the relevant parties; the degree of completeness or incompleteness of the tracks delivered in so-called rough form; and the ongoing litigation and related consequences of this trial. The parties' respective arguments on these matters can then be weighed by the jury as it considers the reality or unreality of the alleged mitigation opportunity, and the reasonableness or unreasonableness of TVT's response to it.

TVT argues that quantifying the value of the CMC Album roughs and factoring them as a reduction in TVT's award for failure to mitigate calls for undue speculation. Such quantification, however, is only slightly more abstract than predicting the value of the lost CMC Album itself for damage calculation purposes. Properly structured, the issue should be subject to appropriate analysis and testimony by expert witnesses. Other concerns over potential jury confusion raised in this Court's March 21 Decision, which led the Court to exclude Gotti's delivery of the roughs from the liability phase, have been largely obviated by the bifurcation of the trial into separate liability and damages phases. On balance, having concluded the liability portion of this trial, the Court finds that the purported delivery of the CMC Album roughs is not more prejudicial than probative as it relates to mitigation issues to be tried during the damages phase.

Additionally, while the proximity in time between the delivery of the roughs on February 26 and the commencement of the trial on March 10 may have undermined the preparations and calculations by TVT's experts as of March 10, before the proceedings were bifurcated, TVT by now has had ample time and notice of IDJ's intent to offer such evidence on the issue of mitigation, to assess the legal basis, feasibility and good faith of Gotti's commitment, and to broaden the analysis of its experts to account for such a contingency. Indeed, TVT may still have some time to do so in advance of the damages phase, even if the task is likely to be more burdensome were it to commence at this stage.

■ Certain correspondence surrounding the attempted delivery of the CMC Album roughs on February 26, 2003, however, reference the satisfaction of alleged legal obligations by Gotti and IDJ and suggest a skirting of legal obligations by TVT. These references render some of these communications more prejudicial than probative for essentially the same

reasons as those discussed with respect to IDJ's purported acceptance and delivery of the Side Letter Agreement on March 7, 2003 discussed above. By referencing intricate questions of mixed law and fact regarding legal obligations that may or may not exist or continue to exist and regarding the satisfaction and avoidance of such obligations, some of these documents present a risk of being overemphasized by and confusing to the jury. As before, such overemphasis cannot, in the Court's view, adequately be cured via an instruction by the Court.

The Court notes that it is the fact of delivery of the album roughs itself, which the Court has deemed admissible, that is of probative value for purposes of mitigation, rather than these collateral documents characterizing alleged legal obligations and other matters reflecting ordinary legal posturing. For these reasons, the documents surrounding the February 26 delivery of the CMC Album roughs, to the extent that they reference alleged legal obligations in the manner described above, are more prejudicial than probative and would likely be excluded from the damages phase. However, the letter dated February 26, 2003 from Ron Sweeney to Steve Gottlieb ("Gottlieb") marked previously as part of Plaintiff's Exhibit 216 can be redacted to account for these concerns as follows— first paragraph, line 2, remove: "pursuant to our contractual agreement with you"; third paragraph, line 1, remove: "are delivering the recordings today pursuant to the contractual obligation and we." It is admissible in the redacted form.[4]

■ In a similar vein, letters to the Court from the parties, in particular, a letter dated April 17, 2003 from TVT counsel Peter Haviland ("Haviland"), indicate that Gotti has again attempted to deliver additional material for the CMC Album to TVT in recent days. The Court's concerns and conclusions set forth above apply to these late developments, meaning the attempted delivery (and, indeed, any actual delivery) of such materials is admissible though any attendant correspondence referencing the satisfaction or alleged skirting of putative legal obligations that may or may not exist or continue to exist will likely be precluded if redaction is not a feasible option. In this vein, the letter dated April 16, 2003 from IDJ Executive Vice President Jeffrey Kempler to Gottlieb, attached to Haviland's April 17 letter to the Court, can be redacted to address these concerns as follows—first paragraph, line 1, remove: "At the request and instruction of Irv Gotti and Lyor Cohen." With this redaction, the document references Gotti's contractual obligations but not those purportedly on the part of IDJ or Mr. Cohen, nor does it characterize TVT's standing pursuant to any such obligations. Therefore, it is admissible in the redacted form.

## C. *TVT'S ATTORNEYS' FEES*

TVT requests that it be permitted it to introduce evidence of attorneys' fees for the jury's consideration as a component of punitive damages. New York law presents a mixture of authority on this matter, an uncertainty that has been recognized by the State's own courts. *See, e.g., Jeffries Avlon, Inc. v. Gallagher,* 149 Misc.2d 552, 553, 567 N.Y.S.2d 339 (1991) (New York permits "evidence of attorneys' fees to be considered by the fact finder in determining an award of exemplary or punitive

---

**4.** If Defendants agree to explain to the jury when offering this document that the contractual obligations mentioned in the letter refer to Gotti's obligations under the Heads of Agreement and not IDJ's obligations under the Side Letter Agreement, the Court will admit this document without redaction.

damages in cases where malice has been proved.... In New York, it has been held that the expenses of litigation, including attorneys' fees, may be considered as an element of punitive damages in a proper case." (citations omitted; internal quotations omitted).); *Russian Church of Our Lady of Kazan v. Dunkel,* 67 Misc.2d 1032, 1061, 326 N.Y.S.2d 727 (1971) ("Where the conduct of a party is of such a nature that similar behavior should be discouraged, the court can award punitive or exemplary damages. However, the court or jury must be satisfied that such conduct was wanton, willful or malicious .... Research of New York law concerning punitive damages has failed to reveal a clear policy on whether attorneys' fees should be included as an element of punitive damages in all cases. A review of this subject ... indicates a division of authority.").

This split is reflected in decisions of this District. *See, e.g., Doe v. Karadzic,* 93 Civ. 0878(PKL), 2001 WL 986545, at *4–*5 (S.D.N.Y. August 28, 2001); *Softel, Inc. v. Dragon Med. and Scientific Comm., Ltd.,* 891 F.Supp. 935, 945–46 (S.D.N.Y.1995) (noting New York court's holding that "it was appropriate for the trier of fact to consider evidence of attorneys' fees in connection with a determination of punitive damages where malice has been proved.").

 In this case, the jury's finding of willfulness concerning Defendants' copyright infringement necessarily reflects a rejection of the validity of asserted licenses purportedly granted by TVT for use of its protected materials. This, in turn, indicates a conclusion that the licenses were procured through fraudulent activity by the Defendants. In light of the Court's instructions on willfulness and on copyright licensing, the Court concludes that a sufficient finding of misfeasance approaching "wanton, willful or malicious" conduct has been established with regard to the activities underlying TVT's state law claims so as to permit the introduction of TVT's attorneys' fees for consideration as the jury determines what amount, if any, of punitive damages to impose.[5] To the extent that Defendants may desire additional discovery concerning the amount of TVT's attorneys' fees, that request should be directed to Magistrate Judge Freeman in accordance with this Court's prior reference.

### D. CONDUCT OF IDJ, MR. COHEN, AND THEIR AFFILIATES

Defendants rely on the Supreme Court's recent decision in *State Farm Mutual Automobile Ins. Co. v. Campbell,* No. 01–1289, ─── U.S. ───, 123 S.Ct. 1513, ─── L.Ed.2d ─── (2003), to argue that TVT should be precluded from offering any evidence of allegedly unrelated bad conduct by Defendants or their affiliates. In *State*

---

**5.** Defendants rely on *Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979), to oppose TVT's application. The *Mighty Midgets* line of cases is inapposite because the holding of the New York Court of Appeals in *Mighty Midgets* addresses compensatory rather than punitive damages, *see, e.g., id.* at 660, 389 N.E.2d at 1081 ("[T]he insurer is not liable for attorneys' fees and disbursements necessarily incurred in the policyholder's successful prosecution of the action it brought to compel the insurer to comply with its policy obligations."), and because it considers, as the Second Circuit has noted, whether there exists an exception to the American fee rule in the insurance context generally as compared to the specific context in which an insurance policy obligates the insurer to defend as well as indemnify the policyholder against loss *see Puritan Ins. Co. v. Eagle Steamship Co. S.A.,* 779 F.2d 866, 872–73 (2nd Cir.1985); *Mighty Midgets,* 416 N.Y.S.2d 559, 389 N.E.2d at 1085 ("[S]uch a recovery may not be had in an affirmative action brought by an insured to settle its rights ..., but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations ...." (citations omitted)).

*Farm,* the Supreme Court reversed a jury's punitive damages award of $145 million dollars in a policyholder couple's suit against their insurance company where the verdict for compensatory damages totaled $1 million.

On the issue of collateral conduct, the Supreme Court addressed two key considerations. First, the Court was concerned that laws of one state governing the determination of punitive damages as punishment and directing consideration of activities occurring in other states, implicate principles of interstate sovereignty, comity, and jurisdiction where these activities are not illegal under the laws of those other states. *See id.,* at —— ——, 123 S.Ct. at 1521–23. To the extent that the Supreme Court's decision was based on such concerns, the facts of the present case are inapposite.

More on point, in overturning the underlying punitive damages award, the Supreme Court was persuaded by the "more fundamental reason" that the amount of punitive damages the jury awarded relied on "conduct that bore *no relation* to the [plaintiffs'] harm." *Id.* at ——, 123 S.Ct. at 1523. (emphasis added). The Supreme Court similarly noted that

> [e]vidence pertaining to [State Farm's so-called "Performance, Planning & Review" policy of meeting corporate fiscal goals by capping payments on claims companywide] concerned State Farm's business practice for over 20 years in numerous States. Most of these practices bore *no relation* to third-party automobile insurance claims, the type of claim underlying the [present] complaint.

*Id.* at ——, 123 S.Ct. at 1519 (emphasis added). To illustrate, the Supreme Court criticized the reliance by the Utah Supreme Court, in upholding the punitive damages award, on "State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees." *Id.* at ——, 123 S.Ct. at 1523. "Because the [plaintiffs had] shown *no conduct* by State Farm *similar to that which harmed them,*" the Supreme Court concluded, "the conduct that harmed them is the only conduct relevant to the reprehensibility analysis." *Id.* at ——, 123 S.Ct. at 1524 (emphasis added).

In contrast to these underlying facts in *State Farm,* the Supreme Court directed that only evidence bearing a sufficient "nexus" to the harm at issue in a given case may be properly considered in determinations of punitive damages. The Supreme Court instructed that conduct otherwise collateral "may be probative when it demonstrates the deliberateness and culpability of the defendant's actions ... but that conduct must have a nexus to the specific harm suffered by the plaintiff." *Id.* at ——, 123 S.Ct. at 1522. In other words, the Court did not, as Defendants here seem to suggest, categorically rule out the introduction and consideration of any such evidence for any purpose in a jury's determination of punitive damages. Accordingly, a jury's punitive damages considerations may still properly include whether a defendant's conduct reflects recidivism of prior similar wrongful acts or represents an isolated occurrence, and whether it was a result of intentional malice, trickery or deceit as opposed to mere accident. *Id.* at ——, 123 S.Ct. at 1521–22. In this vein, the Supreme Court specifically instructed that "courts should look to the existence and frequency of similar past conduct." *Id.* at ——, 123 S.Ct. at 1523 (citation omitted; internal quotations omitted).

This Court cannot address in the abstract and in general form the admissibility of TVT's contemplated evidence which

the Defendants are challenging. The Court will rule on admissibility in context in due course at trial by applying the principles articulated above. The Court calls to the parties' attention, however, that because the disputed evidence in *State Farm* was so starkly unrelated to the harms at issue, by the Supreme Court's own account, the requisite degree of connection appears largely within the discretion of the Court. Hence, the parties should be prepared in due course to explain fully the link between any proposed item of evidence and the harm or harms at issue in this case.[6]

## E. ADMISSIBILITY OF NET WORTH EVIDENCE

IDJ and Cohen argue that evidence of Defendants' net worth is prejudicial and not relevant to the three factors discussed in *State Farm* that guide a court's review of a punitive damages award and that, therefore, such evidence should be precluded from the jury's consideration. The Supreme Court's decision in *State Farm* cannot be reasonably understood to preclude evidence of a defendant's net worth. Indeed, the Supreme Court itself explained in *State Farm* that "[w]ealth provides an open-ended basis for inflating awards when the defendant is wealthy ... *That does not make its use unlawful or inappropriate;* it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct." *State Farm,* —— U.S. at ——, 123 S.Ct. at 1525 (quoting *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 591, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)) (internal quotations omitted). In *Gore,* the Supreme Court explained that "[s]ince a fixed dollar amount would punish a poor person more than a wealthy one, one can understand the relevance of [a defendant's financial position] to the State's interest in retribution ...." *Gore,* 517 U.S. at 591, 116 S.Ct. 1589.

■■■■ It is well-settled, in fact, that evidence of a defendant's net worth is properly considered given the goals of punishment and deterrence served by punitive damages. *See State Farm,* —— U.S. at ——, 123 S.Ct. at 1515 ("[P]unitive damages ... are aimed at deterrence and retribution."); *Hamm v. Potamkin,* No. 98 Civ. 7425(RWS), 1999 WL 249721, at *2 (S.D.N.Y. April 28, 1999) ("Because a court may take a defendant's financial circumstances, wealth, or net worth into consideration when determining the exemplary damages to be awarded ... defendants' financial information is certainly relevant to plaintiffs' claims for punitive damages." (citations omitted)); *Softel, Inc.,* 891

---

**6.** The Court has considered the Defendants' request also as applied to the anticipated evidence identified in their Supplemental Memorandum In Support Of Defendants' Motion *In Limine* To Preclude Certain Evidence And/Or Argument Related To Punitive Damages, Consistent With Recent United States Supreme Court Precedent, dated April 21, 2003 (Defendants' "Supplemental Brief"). The admissibility of most of this evidence has been (or, to the extent judgment as to various matters has been reserved, will be) determined in accordance with the discussion set forth in other sections of this Decision and Order. However, two merit specific discussion in the interest of clarity. Regarding the affidavit of Mike Ciravolo, the Court is inclined to conclude that that document is not relevant to these proceedings based on the representations by Defendants in their Supplemental Brief. However, the Court will not rule on this matter before first seeing a copy of this affidavit and affording TVT an opportunity to explain its relevance. The Court will then rule on admissibility in accordance with the discussion set forth above. The same principle applies with regard to the referenced pleadings and transcripts from other legal proceedings presumably involving, in some way, either or both of the Defendants.

F.Supp. at 945 ("Because the object of punitive damages is to punish the defendant, it is appropriate for the trier of fact to consider the defendant's financial circumstances in determining the amount of punitive damages." (citing *Rupert v. Sellers*, 48 A.D.2d 265, 368 N.Y.S.2d 904, 913 (1975)); *Brink's, Inc. v. City of New York*, 546 F.Supp. 403, 413 (S.D.N.Y.1982) (Weinfeld, J.), *aff'd*, 717 F.2d 700 (2nd Cir.1983) ("If the damage award is to serve its intended objective of punishment for wrongful conduct and deterrence against repetition of a like offense, it must be sufficient to 'smart' the offender which permits a consideration of the wealth of the malefactor.") (interpreting New York law)).

Furthermore, this District has construed New York law as permitting evidence of net worth to be considered as an element of punitive damages even when the defendant is a corporation. *See, e.g., Softel, Inc.*, 891 F.Supp. at 945 ("Plaintiff urged at trial that although it might be appropriate to consider an individual's financial circumstances in assessing punitive damages, it would not be appropriate to consider a corporate defendant's financial situation.... Plaintiff's position is not supported by the decisions of the courts of New York." (citations omitted)). For these reasons, IDJ's and Cohen's motion to exclude evidence of net worth lacks merit and is denied.

### F. *TIMING OF THE ADMISSION OF NET WORTH EVIDENCE; TRIFURCATION*

Defendants further argue that evidence of net worth should not be admitted until after a special verdict confirms that the jury intends to award punitive damages. Their concern is to avoid prejudice as the jury decides this question. In support of this stance, they reference a memo-endorsement dated February 25, 2003 in which this Court indicated that "[a]ttor-

neys' fees and punitive damages issues should be considered following the jury's determination of liability and compensatory damages." Defendants' interpretation of this Court's recent Orders and surrounding events overlooks the quite obvious fact that this Court, for reasons indicated on the record on March 10, 2003, March 14, 2003, and in the March 21 Decision, bifurcated the liability and damage determinations in this trial, a circumstance not expected at the time the Court endorsed its February 25, 2003 Order.

At the time, in the context of the single trial originally contemplated, the parties had proposed evidence relevant to mitigation but prejudicial to liability. In an effort to optimize the standing of both sides in this litigation by preserving the jury's determination of both of these issues as much as possible, the Court determined that issues of mitigation should be decided after liability at a separate component of the trial. This procedure, of course, required that compensatory damages be determined after liability, despite the February 25 memo-endorsement, because mitigation and compensatory damage determinations are intertwined. As stated, these events occurred after the endorsement at issue, and it does not follow that that Order remains unaffected by this Court's later rulings thus described. In other words, it does not follow that the Court envisioned and ordered three distinct trial phases. Nothing of the sort has ever been expressed by this Court, and, indeed, as recently as April 14, 2003, just the opposite was conveyed in a memo-endorsement to the parties.

It is undisputed that New York courts and courts of this Circuit have expressed a preference to bifurcate determinations of the availability and the amount of punitive damages so that financial information relevant to the latter issue does not unduly

influence the former determination. *See, e.g., Brink's Inc. v. City of New York,* 717 F.2d 700, 707 (2nd Cir.1983); *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904, 912 (1975). Since then, however, referring to this process, the Second Circuit expressed the view that while it has repeatedly "approved this approach.... [n]onetheless, whether to bifurcate a trial into liability and damages phases is a matter within the sound discretion of the trial court." *Getty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10, 14 (2nd Cir. 1988) (citations omitted); *see Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 283 (2nd Cir.1990) ("Our approach ... has been to favor bifurcation of the amount of punitive damages as the 'preferred method' ... but to leave the mode of trial ultimately to the discretion of the district judge ...." (citations omitted)); *see also Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 49 (2nd Cir.1996) ("Obviously, the district court has discretion to bifurcate the proceedings into liability and damages phases ....").

▮ More generally, it is well-settled that Federal Rule of Civil Procedure 42(b) "affords the trial court discretion to order separate trials where such an order will further convenience, promote efficiency, or avoid prejudice." *Amato v. City of Saratoga Springs, New York,* 170 F.3d 311, 315 (2nd Cir.1999) (citing Fed.R.Civ.P. 42(b)). Indeed, in *Getty,* the Second Circuit concluded that "we cannot say that the district court's refusal to bifurcate the trial in the interests of judicial expediency was an abuse of its discretion." *Id.* A prior decision of this Court has, as recently as two weeks ago, confirmed that while "the court is well within its discretion to bifurcate a trial, and bifurcation is not unusual, bifurcation is the exception rather than the rule." *Guidi v. Inter-Continental Hotels Corp.,* No. 95 Civ. 9006(LAP), 2003 WL 1846864, at *1 (S.D.N.Y. April 8, 2003) (citation omitted; internal quotations omit-

ted); *Dallas v. Goldberg,* 143 F.Supp.2d 312, 315 (S.D.N.Y.2001).

▮ The Court recognizes the grounds for Defendants' concern. However, this trial has already been bifurcated once, presumably to the ultimate benefit of both parties. The goals underlying that decision were to protect TVT's interest in a liability determination untarnished by misimpressions about the import of Gotti's February 26, 2003 purported delivery of CMC Album roughs (as discussed more fully above), and to not simply preclude Defendant's use of this evidence but, rather, to allow the jury to consider it in due time and proper context in support of Defendants' claims of TVT's alleged missed opportunity to mitigate. In the Court's view, the potential for undue influence of either Defendant's financial condition on the determination of whether to impose punitive damages (as opposed to how much) is far less than on the threshold determination of liability in the first instance.

Given this backdrop, as well as: the implications of the jury's liability determination of willfulness (which, for the reasons explained above in the discussion concerning attorneys' fees, approaches or approximates the standards for imposing punitive damages); the added procedural and logistical burdens on the Court, the jurors, and the parties of preparing for and conducting a third phase of litigation; and the added prejudice to TVT of encountering potentially more delay in the resolution of this matter, this Court's preferred approach is to proceed with a unitary damages phase addressing all outstanding damages issues.

G. *SCOPE OF EVIDENCE OF NET WORTH*

Defendants also move to restrict the evidence of their finances to statements of

net worth. This Court recognizes Defendants' concern for their privacy. Magistrate Judge Freeman has already addressed this concern in the context of the scope of discovery disclosures in this matter, and in an Order dated April 15, 2003, she essentially agreed with the Defendants' position. This Court sees no reason to disturb that Order or modify the disclosures compelled by it, as TVT has not demonstrated a compelling need in accordance with relevant considerations previously articulated by decisions of this Court. *See Hamm,* 1999 WL 249721, at *2–*3; *Hazeldine v. Beverage Media, Ltd.,* No. 94 Civ. 3466(CSH), 1997 WL 362229, at *4 (S.D.N.Y. June 27, 1997). The disclosures ordered by Magistrate Judge Freeman's rulings will be admissible at trial and will essentially cabin the scope of permissible questioning on the subject. The Court will not attempt to further delineate at this stage the precise extent of permissible questioning, nor, as Defendants request, will it categorically preclude TVT at this point from questioning Defendants about their assets. Rather, in accordance with the guidance already provided, the Court will consider the examination questions as presented and in context at trial and rule on any appropriate objections in due course.

## H. *REQUESTING OR SUGGESTING SPECIFIC AMOUNTS AS PUNITIVE DAMAGES*

Defendants assert that "New York courts have held consistently, as a matter of law and policy, that plaintiffs' counsel are strictly prohibited from suggesting to the jury any specific amount of punitive damages to be awarded." (Memorandum Of Law In Support Of Defendants' Motion *In Limine* To Preclude Certain Evidence And/Or Argument Related To Punitive Damages, Consistent With Recent United States Supreme Court Precedent, dated April 16, 2003 (the "IDJ Brief"), at 13.)

Unfortunately, New York law on the matter is far from clear and certainly not as absolute as Defendants' articulation reflects.

Defendants cite four New York cases from the 1970s and 80s issued by the Appellate Division, Third Department in support of their proposition. Each of these cases can clearly be distinguished for various reasons, most notably that none of them even addresses the question of plaintiffs requesting or suggesting specific dollar amounts in the punitive damages context. *See Bagailuk v. Weiss,* 110 A.D.2d 284, 494 N.Y.S.2d 205, 206 (1985) ("[P]laintiffs' attorney proposed or suggested several large specific sums of money as awards for pain and suffering and further suggested the sum of $10,000 annually for the 26 years which plaintiff might have been expected to work as damages for her lost earning ability."); *Bechard v. Eisinger,* 105 A.D.2d 939, 481 N.Y.S.2d 906, 908–909 (1984) (specific dollar references criticized in light of policy against doing so in specific context of medical malpractice claims embodied in N.Y. C.P.L.R. § 3017(c); nonetheless, judgment was affirmed because counsel's remarks still indicated that decision was for the jury to make and because trial court instructed the jury to this effect) (criticized and declined to be followed by *Braun v. Ahmed,* 127 A.D.2d 418, 515 N.Y.S.2d 473, 480 (1987), and by *Thornton v. Montefiore Hosp.,* 120 Misc.2d 1003, 1005, 469 N.Y.S.2d 979 (1983)); *Varriale v. Saratoga Harness Racing, Inc.,* 76 A.D.2d 991, 429 N.Y.S.2d 302, 303–304 (1980) ("First, plaintiff's attorney referred to defendant's wealth . . . . While such a fact is relevant in assessing punitive damages, it has no place in assessing an award of compensatory damages."); *Kusisto v. McLean,* 52 A.D.2d 674, 382 N.Y.S.2d 146, 147–48 (1976) ("[B]y his remarks plaintiffs' trial counsel, after revealing the amount con-

tained in the *ad damnum* clause, went further and proceeded not only to make himself and retained counsel unsworn witnesses, but rendered 'opinion testimony' concerning a matter which was not and could not be in evidence, that is, *the amount of the damages sustained* by the plaintiffs." (emphasis added); nonetheless, no reversal because trial counsel promptly indicated his was merely an opinion and decision was jury's to make alone and because of court's instructions to this effect).

■ As Defendants' own citations imply, their interpretations as addressed above notwithstanding, New York law does not provide a clear answer as to the propriety of plaintiff's suggesting a specific award of *punitive* damages from the jury during summation, though, as regards compensatory damages, the matter seems fairly settled. The New York Court of Appeals has held that it is "counsel's privilege to place before the jury his client's contentions in this regard [the value of injuries and pain and suffering] and, to this end, he [is] entitled to state the amount of damages demanded." *Tate v. Colabello*, 58 N.Y.2d 84, 459 N.Y.S.2d 422, 445 N.E.2d 1101, 1103 (1983) (citations omitted; internal quotations omitted).[7] This approach has since been reflected in the decisions of every department of the Appellate Division including the Third Department (on the prior cases of which Defendants' position purportedly rests). *See, e.g., Garcia v. The City of New York*, 173 A.D.2d 175, 569 N.Y.S.2d 27, 28 (1991); *Kiker v. Nassau County*, 175 A.D.2d 99, 571 N.Y.S.2d 804, 806 (1991); *Baker v. Shepard*, 276 A.D.2d 873, 715 N.Y.S.2d 83, 86–87 (2000); *Restey v. Victory Markets, Inc.*, 127 A.D.2d 987, 512 N.Y.S.2d 938, 938 (1987). The Second Circuit's view of New York law concerning this issue also

accords with this approach. *See, e.g., Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912–13 (2nd Cir.1997) ("[W]e favor a more flexible approach. It is best left to the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions.").

Furthermore, New York courts, including the Court of Appeals, have repeatedly affirmed the right of trial counsel to address matters bearing upon decisions entrusted to the jury:

It is the privilege of counsel in addressing a jury to *comment upon every pertinent matter of fact* bearing upon the questions which the jury have to decide. This privilege is *most important to preserve*, and it *ought not to be narrowed* by any close construction, but *should be interpreted in the largest sense*. The right of counsel to address the jury upon the facts is of public as well as private consequence, for its exercise has always proved one of the most effective aids in the ascertainment of truth by juries in courts of justice, and this concerns the very highest interest of the state. The jury system would fail much more frequently than it now does if freedom of advocacy should be unduly hampered and counsel should be prevented from exercising within the four corners of the evidence the widest latitude by way of comment, denunciation or appeal in advocating his cause. This privilege is not beyond regulation by the court. It is subject to be controlled by the trial judge in the exercise of a sound discretion, to prevent undue prolixity, waste of time, or unseemly criticism. The privilege of counsel, however, does not justify

---

7. The *Tate* court promptly added that the trial court's jury charge explained "that the ultimate measure of damages was to be a sum of

money which will justly and fairly compensate the plaintiff." *Id.* (citation omitted; internal quotations omitted).

the introduction in his summing up of matters wholly immaterial and irrelevant to the matter to be decided, and which the jury have no right to consider in arriving at their verdict. The jury are sworn to render their verdict upon the evidence. . . . Where counsel in summing up proceeds to dilate upon facts not in evidence or to press upon the jury considerations which the jury would have no right to regard, it is, we conceive, the plain duty of the court, upon objection made, to interpose . . . .

*Williams v. Brooklyn Elevated R. Co.*, 126 N.Y. 96, 26 N.E. 1048, 1049 (1891) (emphasis added); *see People v. Priori*, 164 N.Y. 459, 58 N.E. 668, 670 (1900); *Braun*, 515 N.Y.S.2d at 475–76 (quoting *Williams* in the context of permitting requests for specific sums as damages); *People v. Marcelin*, 23 A.D.2d 368, 260 N.Y.S.2d 560, 561–62 (1965).

On balance, the Court, having been presented with no convincing basis to categorically preclude TVT from requesting in its summation a specific amount in punitive damages, and in light of both the acceptance of doing so in the context of compensatory damages and the deference under New York law permitting trial counsel latitude to address issues bearing upon matters to be determined by the jury, concludes that Defendants' request in this regard should be denied.

## I. GENERAL ADMONITIONS CONSISTENT WITH STATE FARM

Finally, Defendants ask this Court to admonish TVT's trial counsel "that all evidence and argument that is inconsistent with the guidelines set for the in the Supreme Court's *State Farm* decision is barred from the damages phase of the trial." (IDJ Brief, at 15; (emphasis in original).) Of course, binding Supreme Court precedent dictates the behavior of the parties and, indeed, this Court, and the parties should be prepared to conduct themselves accordingly. To the extent the *State Farm* decision implicates the structuring of the proceedings and presentation of evidence to the jury preverdict, the Court is mindful of these and related concerns, and rather than issue general, speculative admonitions of the sort that Defendants seek at this stage in the proceeding, it will, instead, entertain specific objections in context at trial.[8]

## II. CONCLUSION AND ORDER

For the reasons discussed above and in accordance with the considerations there expressed, it is hereby

**ORDERED** that the portion of TVT's motion seeking an Order excluding from the damages phase the version of the Side Letter Agreement signed by IDJ and delivered to TVT on March 7, 2003, along with the corresponding Approval Memo, is granted; and it is further

**ORDERED** that the portion of TVT's motion seeking an Order excluding evidence of Irv Gotti's February 26, 2003 purported delivery of certain so-called "roughs" for the CMC Album to TVT is denied; and it is further

**ORDERED** that, in light of more recent delivery or attempts at delivery of material for the CMC Album by Gotti to TVT, of which the Court was made aware through various recent correspondences from the parties, evidence of such delivery or at-

---

**8.** Of course, the relevant issues and concerns would differ post-trial, at a posture where the Court is reviewing a verdict after the jury has had the opportunity to render its determinations consistent with the Seventh Amendment in the first instance. *See, e.g., State Farm*, —— U.S. at ——, 123 S.Ct. at 1520 ("In light of these concerns . . . we instructed courts *reviewing punitive damages* to consider three guideposts . . . ." (emphasis added)).

tempted delivery is also admissible; and it is further

**ORDERED** that the portion of TVT's motion seeking an Order excluding from the damages phase the correspondence surrounding Gotti's February 26, 2003 purported delivery of roughs for the CMC Album is granted in part, though it is denied as to the letter from Ron Sweeney to Steve Gottlieb dated February 26, 2003 in redacted form; and it is further

**ORDERED** that, in light of more recent delivery or attempts at delivery of material for the CMC Album by Gotti to TVT, of which the Court was made aware through various recent correspondences from the parties, the correspondences between the parties surrounding these deliveries or attempted deliveries—to the extent that they reference compliance or noncompliance with legal obligations by IDJ or Lyor Cohen or TVT that may or may not exist or continue to exist—are precluded, though the letter dated April 16, 2003 from Jeffrey Kempler to Gottlieb is admissible in redacted form; and it is further

**ORDERED** that the portion of TVT's motion seeking an Order permitting it to introduce evidence of its attorneys' fees as a component of punitive damages is granted; and it is further

**ORDERED** that the portion of Defendants' motion seeking an Order precluding evidence of their net worth is denied; and it is further

**ORDERED** that the portion of Defendants' motion seeking an Order trifurcating this trial is denied; and it is further

**ORDERED** that the portion of Defendants' motion seeking an Order limiting evidence of their finances to statements of net worth disclosed during discovery is granted in accordance with Magistrate Judge Freeman's Order dated April 15, 2003, which will guide the bounds of ad-

missible documentary and testimonial evidence; and it is further

**ORDERED** that the portion of Defendants' motion seeking an Order precluding TVT from requesting or suggesting a specific amount in punitive damages is denied; and it is finally

**ORDERED** that judgment is reserved as to the remaining portions of the parties' motions pending additional information and proffered evidence in accordance with the discussion set forth above.

**SO ORDERED.**